Good morning, Your Honor. It's John Lemon from Mr. Cervantes-Gonzales. Your Honor, the Court should reverse Mr. Cervantes' conviction and issue instructions to dismiss the indictment, because he was deported. The deportation underlined his 1326 conviction. At the deportation hearing, the immigration judge erroneously concluded that he had been convicted of an aggravated felony and that he was, therefore, ineligible for relief from deportation. In fact, as was made clear with this Court's decision in Yee v. INS, he had not been convicted of a cancellation of removal. And because that underlying deport was unfair, he his deportation hearing violated due process. If we agree with you in your primary theory, why shouldn't we remand for the determination of prejudice? Well, I was actually about to say, I just discovered yesterday, and I submitted – I apologize for the late notice, but it intended to gum-sheet additional authorities, and apparently they don't do that here anymore. But I did submit a list of additional authorities. And there's a case that directly controls the outcome here called United States v. Camacho-Lopez, and that's at 450 F. 3rd, 928. It's a 2006 case from the Ninth Circuit. And in that case, specifically with respect to prejudice, that court held that – or this Court held that where the only allegation in the notice to appear related to the aggravated felony, and the immigration judge erroneously concluded that the charge was, in fact, an aggravated felony, that the prejudice issue was decided, and they dropped a footnote and said – and compared the case of Polaris-Galan where they were – they remanded for the hearing – for a hearing as to prejudice. And specifically, and the distinguishing factor was that in Polaris-Galan, there were additional charges in that notice to appear. In the original document. And this was the only charge here. Okay. Right. And that – this is the only allegation. The California 459 burglary allegation was the only one in the NTA in this case. And back to – So it's – so under Camacho, it's automatic prejudice. Yes. Where there's not an allegation – where there's no allegation of other charges in the notice to appear, under Camacho, there's automatic prejudice. But even if we get to a prejudice analysis, we have someone who had been a citizen – who had been a legal permanent resident for nine years. He had been living in the United States for virtually his entire life. His parents and his siblings, four siblings, live in Escondido. And if we – even if we're to analyze whether he had a plausible claim, certainly the fact that he had lived in this country for so long, that he was a legal permanent resident for nine years, and that he had family in Escondido, that at least rises to the level of a plausible claim. And I think that was adequately fleshed out before the district court. The significant thing about Camacho Lopez that is just directly on point and is indistinguishable from this case, because in Camacho, the defendant in that case had been deported where the immigration judge had determined that he had committed an aggravated felony. And the aggravated felony was negligent homicide as a result of, I think, driving a vehicle at the blood alcohol level. In any event, after – the controlling authority in the Ninth Circuit at the time was that that was, in fact, an aggravated felony. Subsequently, the Supreme Court held that it wasn't. And then in a related case, the Ninth Circuit also held that it wasn't. And the Camacho Lopez court specifically held that even though those cases came after the deportation hearing for Camacho Lopez, that his immigration hearing was unfair and the due process had been violated. So this specifically addresses the, quote, unquote, retroactivity argument that had been advanced by the government in their brief. And that's why I want to bring it to the Court's attention at the outset. I think we have your argument in hand. Do you want to save some time for rebuttal? Yes. Okay. Thank you. Oh, can I – I'm sorry. I just have – assuming we get to this issue, the issue of the discovery of the files and the questions about the files from the Laguna – is it Laguna Niguel? Laguna Niguel, right. Laguna Niguel. Was there any – did you present or do you have any evidence that any of your – that will result that your client's safe file was there, was stored there? No, there's no – the proffer was that – the trial, the proffer was that a document – an application for adjustment of status had been submitted by Mr. Cervantes in 1996. That – beyond that, we don't know whether his safe file was ever in Laguna Niguel or not. But our position is that this cuts to the very heart of what it means to carry the burden of proof and to have to prove someone guilty beyond a reasonable doubt and to allow cross-examination on what ultimately goes – what ultimately is decided by the trier of fact as to whether the government has carried the burden of proof. And I guess to put that a different way – So you're saying the government has to prove that the A file wasn't there? No. What I'm saying is that the government presents an A file custodian who invariably testifies over objection that, in his opinion, if this document existed, it would be in the A file. And yet the jury isn't allowed to hear that, in fact, they lose documents sometimes. In fact, they've shredded them. And it – at a minimum, the trial attorney should have been permitted to cross-examine on that point because the government – neither the government nor the defendant can establish conclusively, at least to my knowledge, that the A file was, in fact, in Laguna Niguel during the time the documents were being shredded or not. And that's what Judge Benitez wanted you to show, because we know that there were documents shredded there. So I just wanted to at least have you make a showing that that's what the materials were. Right. And I don't know how we possibly could. Yeah. Okay. Sorry. Before I sit down, would Your Honor's like me to address the issue of this notion that the government advanced in their 20HA letter that I received yesterday that even an unlawful deport can be an element, not for an enhancement. But apparently the government's position with respect to – with respect to unlawful deportations, based on the 20HA letter that I received yesterday, is that a reinstatement by itself may support a 1326 conviction as opposed to an enhancement under 1326B, which was the issue in Luna Matayaga, regardless of whether the underlying deport complied with due process. So taken to its logical conclusion, it would suffice as an element of a 1326 charge to simply round people up, expel them physically from the country with no process whatsoever, and then say, well, that satisfies the deportation element of 1326A if they subsequently got a reinstatement after that initial flawed illegal deportation. That simply would utterly eviscerate what the Supreme Court held in Mendoza-Lopez. There's been no opinion of this Court that goes that far. Luna Matayaga dealt with the enhancement under the 1326B provision to the 20-year statutory maximum. But even Luna Matayaga specifically contemplated at least one full and fair hearing with the opportunity for judicial review. So with that, Your Honor, unless I have – unless you have other questions, I'll reserve the rest for rebuttal. Roberts. Thank you. Roberts. We'll hear from the government. Christopher Rounding, D.A.F.E., United States. Your Honors, in this case, the offender was convicted on February 2006. He was convicted pursuant to a verdict form that required a specific and preceding finding by the jury that the defendant was deported after 2002. In this specific case, that finding was made as the judge instructed the jury that they had to find that fact before reaching the elements of a 1326 crime. So the case that we have before us is a case where the jury specifically found that the defendant was deported after 2002. With regard to Mr. Lemon's arguments with regard to the validity of that deportation itself, just to quote what's specifically in the 28J letter itself, the statement of the Ninth Circuit is, Reinstatement of a prior removal order, regardless of the process afforded in the underlying order, does not offend due process because reinstatement of a prior order does not challenge the alien's rights or remedies. And continuing along with that, it's true of the case that's involved with a reinstatement itself is helpful. In this case specifically, a notice to reinstate issues. At that point, the alien has the opportunity to challenge that notice. That's what the notice is. That opportunity wasn't elected. The defendant, Mr. Cervantes, was deported again pursuant to that. And that was the basis of the jury's finding in the end. The jury form itself, which is appended in the supplemental excerpts of record, the only interpretation of the finding that the jury made is that they were relying upon a later deportation. But do we do, is that what we're supposed to be looking at? And we're looking at whether the district court should have dismissed the indictment. So don't we look at what the district court did before we even get to the jury trial? Well, Your Honor, the judge's ruling was essentially mooted by the finding of the jury. Now, that can often be the case in challenges to the indictment itself. And, in fact, that's what happened here. By way of example, specific findings by a jury relating to an apprendee-type issue can cure certain apprendee-type notice problems in the indictment itself. And that's a similar situation to what we have here, which is that we have a specific jury finding that said that the defendant was deported after 2002, specifically the September 22, 2003 removal that the defendant suffered. Counsel? Yes, sir. My question, was that a reinstatement? That was a reinstatement, Your Honor, yes. Okay, so I think I'm familiar with Morales, but if there's no constitutional problem in the reinstatement procedure generally, still, if it's an unconstitutional deportation that's being reinstated, wouldn't that be a problem? Your Honor, again, the process that — simple answer, no. The process itself of the reinstatement affords an opportunity to challenge the reinstatement itself. So it goes back to an exhaustion problem with the deportation itself, which is that there's no — You mean when the alien comes in, they say, do you want to say anything, and he signs off on a form? Well, it's certainly not as simple as that. Well, sure it is. That's what — that's what was at issue at Morales and all the other cases, that the aliens called in on reinstatement, and they said, do you want to say anything? And you sign the form yes or no. It's not — there's no I.J. There's no — there's no showing. That's not required under Morales. So Morales was not a 1326 case, right? That's correct. Yes. So the authority essentially that you've been relying on for reinstatements have to do with the validity of the reinstatement itself, not the use of the reinstatement in a criminal proceeding, because then we have due process concerns that are different from what happens in a reinstatement. Now, Morales was just a reinstatement case. It talked about — about what was necessary in order to have a constitutional reinstatement, or whether it was statutorily required, how do we construe the statute. It doesn't have anything to do with 1326. Well, again, Your Honor, the quantum of due process is the same, because we're looking at the fundamental fairness of that due process hearing itself. Surely, the procedures afforded aren't retroactively changed just because the defendant at a later point is charged with a 1326 charge. The procedures have to be correct, but they have to be correct based upon the same standards that are stated under Morales' gerrito as for a 1326 case. Now, with regard to the process afforded to then challenge that, that's a different inquiry. But the process afforded at the deportation stage itself, that's the same in every case. No. I mean, I think that, you know, basically the issue on reinstatement is far different. We've agreed under the statute that it can be a summary procedure based on what's happened before, and we, you know, Morales, we held that. We upheld the statutory construction. But the question in a criminal case is whether or not, and I don't think the law has changed at all by Morales, whether or not due process was afforded in the initial removal. And I don't see anything in Morales that would change that or say that now we have to look to the reinstatement to see whether the reinstatement was proper. I mean, to get back to Judge Gould's question, if you have an unconstitutional removal in the first instance, you can't cure that for criminal purposes by a reinstatement of the original judgment. Can you? Well, Your Honor, again, the alien, the individual that defended in this case Mr. Cervantes, has an opportunity to stop that. How exactly? By saying I don't agree with you, and then he's removed. That's the agency action finished. There's no I.J. involved in that? Well, Your Honor, he has an opportunity, as I understand it, he would have an opportunity with the immigration official who summarily was reinstating. But he wouldn't have a hearing before an I.J. in that reinstatement procedure. Is that right or wrong? Your Honor, that is right, although I believe there is an opportunity at a certain point in certain circumstances to get back before an immigration judge. Okay. Really? Can we go to the entire? Okay. Go ahead. No, no, no. You, please. The reason I say that is because the government urged just the opposite in those cases. I mean, we all sat on those cases. We, you know, we've heard a lot of presentations. I mean, basically, there's an, I mean, I heard in this, I think in this courtroom, government attorneys saying there is, that's it, that you don't even have a right of habeas. So, when you say, glibly, they have another right, I don't mean to overreact, but I'm, because we've been through this so many times, I, what is it? Well, then, Your Honor, perhaps it would be most helpful to talk about the 1998 deportation itself. Okay, but I, but let me, I cut off Judge Gould from a question, so. Well, I was, I was going to try to get you back to the prior issue. Yes, sir. Which is, let's, for a moment, I'd, I'd like to not assume the 1998 deportation was unconstitutional. But, can you address this Camacho case, which was just cited to us this morning? And I've now got a copy in front of me, but I didn't sit on that one, so I haven't studied it yet. But, can you, can you distinguish that case, or is, is the appellant's lawyer right, saying it's on point here, and invalidates the 98 deportation? Yes, Your Honor, I, I can distinguish it. As set forth on page 930 of that decision, the, a number of issues were conceded by the United States in that case, which is the only reason why the Court got to the specific question it did. So, these are, I believe, headnotes three and four on page 930, directly below the discussion header. And it says, no, I'm sorry, the second paragraph. The government concedes that the crime of violence, this is paraphrasing, crime of violence determination applies to that case. That the, I mean, we should. The government, the government conceded in that case that the Leocal definition of crime of violence would apply, right? That's correct. Now, so here they've, I guess the government's not conceded that the, the ye definition would apply, right? That, that, that's correct, Your Honor. And the reason for that, again, is the ye case came out in 2000, two, two years after the determination itself. Why did that make a difference in terms of the criminal case? It makes a difference because, again, we're talking about process, and process is about the procedures themselves. And process doesn't have to be, should not be retroactively reordered. Well, how do you, how do you deal with Pallardus Galan, then? I mean, Pallardus had the same situation, and it's, and it said, look, there, there's a, we have a, a, well, in fact, in that very case. Because, obviously, that was making law, and applied it to an alien who was making the argument in that case. It didn't even have as good a circumstance as ye. It applied in the first instance, and applied it to an alien. And talked about, in that case, talked about the immigration judge believing, erroneously, that this constituted a qualifying predicate offense. Well, then, again, the difference here is that if we're going to apply it fully retroactively, then we have to consider also the Duenas-Alvarez case, which puts Plenuliar and the United States would submit ye into doubt based upon the determination by the Supreme Court that the aiding and abetting language in, in Turalia, that this specific charge as 459 charge does not invalidate it as the qualifying crime of the immigration naturalization act. Well, maybe so, but how, how do we overrule ye here? How, how do you overrule? Yes. Well, the, the point, again, isn't to overrule it. The point is to focus specifically upon the process provided to Mr. Cervantes on, on the date of his hearing, which is that he was treated exactly the same as everybody else was. And, in fact, the only reason why he sits differently is because he decided not to follow the immigration judge's order, and after a series of other crimes, come back and be charged with another crime. So whereas a lot of people have, did accept the law in the circuit and in the immigration courts as set forth in 1998, he decided not to. But I don't see the difference between that and what happened in Pilar de Escalon or in Leon Paz, where you have the I.J. erroneously applying law that turned out later, I mean, corrected later, was applying, well, the I.J. thought that he or she was applying the correct law at the time, applied it to a number of people, comes up to us and petitioned for review, and we say, no, you applied the wrong law. I mean, retroactivity principles in criminal are different. I mean, Teague doesn't apply because that only applies in cases of criminal procedure or constitutional rules of criminal procedure, not substantive law. The rule in substantive law is that we interpret substantive law and apply it to all cases that are pending. Well, Your Honor, with regard to that retroactivity principle you're talking about there, this is a different type of case than that should be applied. As I understand it, there's a principle of law in the Ninth Circuit that when interpreting a statute, that it goes all the way back in time, if that decision goes back. Well, it's not only in our circuit. Well, that principle, however, is not universal through all circuits. But with that said, that principle here doesn't necessarily apply because we're dealing with a more complex inquiry, inquiry that, as the Court repeatedly emphasized, has to do with constitutional due process, the interplay of two statutes at a bare minimum, the California Penal Code relevant section and also the Immigration and Naturalization Act, that type of complex, that type of complex inquiry should not be automatically retroactive, and it's not consistent with providing due process to a defendant in a case. Well, how do you distinguish those cases? You cited Pilardis-Galland, so you're familiar with it. That's what happened in that case. Well, Your Honor, I believe the retroactivity issue wasn't squarely before the Court there as a defining issue. Okay. In Camacho, counsel. Yes, sir. Leocal is a 2004 decision, and Camacho deals with 1998 deportation. So why, if the government conceded that Leocal applies there, why can the government justify saying Yee doesn't apply here? Well, what's the difference? I realize they made a concession, but how can the government concede in that case and not here? Well, Your Honor, I can't speak as to exactly why that prosecutor went the way he or she did. However, I am among other things, it could be that they wanted to focus specifically on that prejudice issue, on appeal. The prejudice was the specific issue that they thought was the important one in that specific case. Here, the United States did and does object to the retroactive application of that principle. And the question of law, why does whether or not the government concedes it matter? Does it matter at all? Because we have to apply what we view as the correct rule of law, regardless of what the government concedes or doesn't concede. Your Honor, because then that's the issue squarely before. There's a visual step the court has to take. The court has to make that decision as to what law applies. That's the difference of the concession. Well, don't you think that in Camacho, if the government conceded something that the three-judge panel thought was wrong, it would say, although it doesn't agree with it, it wouldn't apply it that way? Well, one of the bedrock judicial principles is not to decide any more than is necessary to decide to reach the outcome. Well, we have to decide this one here. Right. And exactly correct, Your Honor. And the United States disputes that issue. And asks that the law be considered. The only point I'm making is it really doesn't matter. We have to follow the law as we read the law. It really doesn't matter what the government or defense counsel describes it as or concedes to. We still have to follow the law that we as we read it. That's correct. As a fundamental a priori matter, the court has to determine what law applies. Well, let's take a hypothetical and see how far your argument goes. Because I think what you're saying is, if an I.J. gives the wrong, applies the wrong law, we can't look at it because if the I.J. does it uniformly, it simply makes an error of law in deciding not to advise the alien of his or her rights. We can't touch that. Well. Isn't that what you're saying? I wouldn't characterize it the same way, Your Honor. But the fact of the matter is, again, process. And process involves the opportunity. So you are saying that, though, aren't you, really, at the core? As long as all aliens on that day were treated wrongfully but equally, it doesn't make any difference? No. Because the question, again, is as to what error specifically is being alleged. If, for instance, every alien was denied the opportunity to speak at all during the hearing, that would be something that would be error in retroactive. However — Well, but take a look at Polartis. The government contends that the I.J. was not obligated to advise Polartis of his eligibility for relief from deportation because she correctly characterized the conviction as an aggravated felony. It goes on to say she was wrong, and it reverses her, applying it retroactively. How do we get around that? Because, again, that was the fundamental direct challenge to that specific one. Here, what we're talking about — No, no, no. This is in the context of a 1326 conviction. Yes. And that was the — that challenge was made by — It's not like E.E. where they're challenging it in a deportation context. I mean, this is a primary challenge. They say, okay, the I.J. got it wrong in the first instance. It didn't even have ye to rely on. We're going to decide that that is not an aggravated felony, and, therefore, it applies to you. Now, here we have — it's a stronger case for the defendant because we have law, ye, that says, no, we've interpreted the statute. It doesn't apply as an aggravated felony, and we're bound to apply it now. How can we treat this defendant differently than we would ye? Well, because what we're dealing with here is we're dealing with a — the fundamental question here is whether the immigration judges should be retroactively second-guessed and the process reordered at each step along the way. You know what? They're not second-guessing the immigration judge. What they're saying is, was there a lawful deportation that can form the predicate for a 1326 conviction? Right? Right? It's not second-guessing. We're not reviewing the I.J. We're reviewing whether the deportation was lawful such that the 1326 offense can be prosecuted. Correct. And the context, then, should be we go back and we look at the process itself at that point in time, we have the judge deliberating on precisely this point and saying, look, I find specifically that this — that this type of crime is one that doesn't merit any type of — any type of relief. The judge was wrong, and the judge didn't — I mean, he had the benefit of Taylor. Taylor had already been decided. And he misinformed the defendant. He said, you're not eligible for any relief, and that was wrong. He was eligible for relief. Well, again, Your Honor, the — because of the Duenas-Alvarez case, it's not entirely clear that — that the judge is wrong. Because Pannulliar is currently in bonk, I understand, is the — argued in bonk fairly recently by my colleague, Mark Rahe, which has to do with — with, I believe, the same exact crime. Well, I take your point, but we can't overrule Yee sitting as a three-judge panel, and I would be disinclined to since I was on the Yee panel. Right? No, but I'm — that was just an aside. No, I mean, we can't — we have to apply Yee just as a — you know, so we're in the same — same situation. What you're asking us to do is to speculate, I think, that Yee is no longer good law. No. At the most, what I'm asking you to do is to wait until there's the decision that makes it clear whether Yee is good law again. And at a minimum, I'm asking the Court to look at the procedure and what was actually done in 1998, which is that this was a defendant who was treated with due process at the time. I think we have some ships passing the night in our discussions, though, because if this were a reinstatement case, you might have a point. But as a criminal case, when it's a predicate conviction, and we know that there is now, in hindsight, a due process error, and that's in the present, softly, you use this case, and it's for a conviction. And that's an entirely different analysis. And that's what the — all of our 1326 cases hold, that you — that the alien's got to be properly advised, and we look at the statute as we construe it. Well — Not as the I.J. construed it at the time. Again, Your Honor, if the fundamental question is due process itself, then I don't believe this panel is confined to not look at Duenas-Alvarez and to look at this issue. Among other things, would it be — if you look at Duenas-Alvarez, and one of the foundation principles of Yee is that this aiding and abetting liability is problematic. Duenas-Alvarez says that that's not a valid inquiry. Then therefore, how is there an error by the judge herself, Judge DiPaolo? As a — the inquiry can't be as narrow as is sometimes urged. We have to look at the process. We have to look at whether a fair shake was given. The fact of the matter is, as we sit here today under the state of the law, that Mr. Cervantes was given a fair shake from multiple perspectives. Well, he was only charged with one offense in the notice of deportation. That's all that's on the table. I mean, there's only one disqualifying offense that's on the table, right? There's only one offense in 1998. That's correct. Any further questions? Thank you for your rebuttal. Thank you, Your Honor. Just briefly, with respect to the Morales-Escuero question as to Morales-Escuero sanctioning the use of a reinstatement for some other purpose, I just — the majority opinion of Morales-Escuero made clear, actually, that that was not the intent of that is to cause Morales' removal, thus denying him any benefits from his latest violation of U.S. law. The reinstatement order imposes no civil or criminal penalties, creates no new obstacles to attacking the removal order. Then they go on to say the Supreme Court noted at this very point, while the reinstatement law looks back to a past act and its application to an alien who has reentered illegally, the provision does not penalize an alien for reentry. Civil and criminal penalties do that. So I think it's pretty clear, even from the majority's position in Morales-Escuero, that applying that removal in this context is — would be inappropriate. I agree with Your Honor that this really isn't fundamentally a retroactivity question with respect to this opinion. The question is, the State of prior precedence does not alter the fundamental fairness of being — of bringing a Section 1326 charge today on a deportation that everyone agrees was invalid under the current law. So that's — it's not a question of going back in time. The question is, Mr. Cervantes has been prosecuted today. We know that that deport wasn't good under today's law. And I would also add that Mr. Cervantes actually does have a better position even than Mr. Camacho-Lopez, because, as Your Honor pointed out, there was no contrary opinion supporting the immigration judge at that time. In fact, Taylor had already been issued, and the immigration judge should have been on notice that perhaps that 459, the California burglary conviction, is overbroad. And with that, I would submit it unless the Court has additional questions. Roberts. Roberts. Thank you. Roberts. No, I think — I think we have the case in hand. I want to thank both of you for your arguments. It presents an interesting question, and we'll be in recess for the rest. Thank you.
judges: Thomas, Wardlaw, Gould